**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen (LR-5733)
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIHAO CHEN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, AND ROBERT L. ROSIELLO, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff Lihao Chen, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other

matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"), as well as media and reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased the publicly traded common stock of Valeant from February 28, 2014  to October 21, 2015, both dates inclusive ("Class Period"). Plaintiff seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District and Defendants are present in this District.

5.      In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff Lihao Chen, as set forth in the attached PSLRA Certification, acquired  Valeant securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant Valeant is a Canadian corporation with its United States headquarters located at 400 Somerset Corporate Blvd., Bridgewater, NJ 08807. Valeant securities trade on the NYSE under the ticker symbol "VRX."

8.      Defendant J. Michael Pearson ("Pearson") is and has been the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Valeant during the Class Period.

9.      Defendant Howard Schiller ("Schiller") was Chief Financial Officer ("CFO") of Valeant from December 2011 to June 2015. Defendant Schiller is a

Corporate Director and has served on Valeant's Board of Directors since September 2014.

10.     Defendant Robert L. Rosiello ("Rosiello") is and has been the Chief Financial Officer ("CFO") of Valeant since July 2015.

11.     Collectively, Defendants Pearson, Schiller, and Rosiello are herein referred to as "Individual Defendants."

12.     Collectively, Defendant Valeant and Individual Defendants are herein referred to as "Defendants."

<u>**DEFENDANTS' MISCONDUCT**</u>

<u>**Background**</u>

13.     Valeant is a pharmaceutical company that develops, manufactures, and markets pharmaceuticals, over-the-counter products, and medical devices worldwide. Valeant offers prescription medicines to treat a wide variety of ailments including skin conditions, such as acne, weight loss, vitamin deficiency, major depressive disorders, hypertension, angina, and neurological diseases. Over-the-counter products include products targeting skin and hair care, vitamins, and pain relief.

14.     Valeant manufactures expensive drugs and of late, has been increasing the price of the drugs. Many health insurance carriers will not pay for coverage to patients or patients are subject to very high co-payments for Valeant's drugs.

15.    Valeant's pricing of its drugs has drawn scrutiny and investigation by Congress and the U.S. Attorney offices for Manhattan and Massachusetts.

16.    Valeant distributes and sells many of its products through specialty pharmacies.  Specialty pharmacies, also known as third-party-pharmacies, are a channel for pharmaceutical companies to sell high-priced drugs when the drugs are not covered by some consumers' health insurance plans or which demand consumers to pay a high co-payment. Valeant's use of specialty pharmacies which Valeant controls allows the Company to increase sales of its high-priced drugs and to prevent patients, practitioners, and insurance companies from switching to cheaper, generic drugs.

17.    Philidor RX Services, LLC ("Philidor") is a specialty pharmacy which sells Valeant's products. Valeant is Philidor's only client. Philidor was incorporated in Delaware on January 2, 2013. Philidor registered as an in-state pharmacy in Pennsylvania on February 19, 2013. Philidor is located in Hatboro, Pennsylvania.

18.    KGA Fulfillment Services, Inc. ("KGA") was formed in Delaware on November 14, 2014. KGA is one of Valeant's wholly owned subsidiaries.

19.    In January and February of 2015, KGA was listed as a secured party on UCC-1 liens places against members of Philidor's ownership group including David Cowen, Elizabeth Kardos, Timothy and Paula Schuler, Andrew Davenport,

4

David Ostrow, David Wing, John Carne, Matthew Davenport, Fabien Forrester-Charles, End Game Partnership LLP, End Game LP, and Michael Ostrow.

20.     R&O Pharmacy Inc. ("R&O") is a pharmaceutical company located in Camarilla, California.

## False and Misleading Class Period Statements

21.     On February 28, 2014, the Company filed a Form 10-K for the year ending December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Pearson and Schiller. Attached to the 2013 10-K were Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Pearson and Schiller attesting to the accuracy of the financial statements, that all fraud was disclosed, and the Company had adequate internal controls.

22.     On February 22, 2015, the Company issued a press release reporting its fourth quarter and full year 2014 financial results. The press release also included full year guidance for 2015 taking into consideration the Company's acquisitions.  "as well as expected business outperformance" would be "updated on first quarter 2015 earnings call." Defendant Pearson's comments included in the press release state in relevant part:

> *Valeant's relentless focus on building diversified, durable businesses with strong organic growth platforms, coupled with disciplined business development, is paying off for all of our stakeholders… Outstanding growth in the U.S*., most notably dermatology, offset the negative impact from foreign exchange.  In addition, we continued to see strong organic growth in several emerging markets such as China,

the Middle East and Russia. ***With our strong finish to the year, we are well positioned for another year of outperformance in 2015.***

(emphasis added).

23.     On the same day, Valeant issued a press release announcing that it agreed to buy Salix Pharmaceuticals ("Salix") for $158/share or approximately $14.5 billion. The purpose of the acquisition was to expand Valeant's gastrointestinal drugs to its portfolio.

24.     On February 25, 2015, the Company filed a Form 10-K for the year ending December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Pearson and Schiller. Attached to the 2014 10-K were SOX certifications signed by Defendants Pearson and Schiller attesting to the accuracy of the financial statements, that all fraud was disclosed, and the Company had adequate internal controls. The 2014 10-K makes no mention of Philidor.

25.     The 2014 10-K reiterated the financial results included in the Feburary 22, 2015 press release but also included in part:

> ***Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized operating structure***. We have an established portfolio of durable products with a focus in the eye health and dermatology therapeutic areas. We believe these products have the potential for strong operating margins and solid growth and are particularly attractive for a number of reasons including:
>
> > • They are largely cash pay, or are reimbursed through private insurance, and, as a result, are less dependent on increasing

government reimbursement pressures than other products;
• They tend to have established brand names and do not rely primarily on patent or regulatory exclusivity;
• They tend to have the potential for line extensions and life-cycle management programs; and
• They tend to be smaller on an individual basis, and therefore typically not the focus of larger pharmaceutical companies.

**Another critical element of our strategy is business development**. We have completed numerous transactions over the past few years to expand our portfolio offering and geographic footprint, including, among others, the acquisitions of Bausch & Lomb Holdings Incorporated ("B&L") and Medicis Pharmaceutical Corporation ("Medicis"). We will continue to pursue value-added business development opportunities as they arise.

**The growth of our business is further augmented through our lower risk, output-focused research and development model**. This model allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense. This is achieved primarily by:

• focusing on innovation through our internal research and development, acquisitions, and in-licensing;
• focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services;
• focusing on critical skills and capabilities needed to bring new technologies to the market;
• pursuing life-cycle management programs for currently marketed products to increase such products' value during their commercial lives; and
• acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

(emphasis added).

26.    Attached to the 2014 10-K as Exhibit 21.1 was a list of Valeant's

subsidiaries. Included on that list was KGA Fulfillment Services, Inc.

7

27.    On March 16, 2015, Valeant issued a press release announcing that Valeant and Salix had altered the terms of their merger agreement and that Valeant increased the offer price to Salix to $173/share for a total of approximately $15.8 billion.

28.    On March 17, 2015, the Company issued a press release stating that it would be issuing 7,286,432 shares at the price of $199/share in its $1.45 billion offering of common shares in connection with the acquisition of Salix.

29.    The following day, on March 18, 2015, the Company filed a Prospectus Supplement and Registration Statement (the "Prospectus Supplement") for its offering of $1.45 billion of common shares of Valeant in relation to the tender offer for Salix in connection with the merger. The Prospectus stated that shares would be offered at $199/share for total proceeds equaling $1,449,999,968. The Prospectus Supplement stated in relevant part:

*Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our low selling, general and administrative ("SG&A") cost structure and decentralized operating model to ensure decisions are made close to the customer*.

\*       \*       \*

*The growth of our business is further augmented through our lower-risk, output-focused research and development model, which allows us to advance certain development programs to drive future revenue growth, while minimizing our research and development expense*. This is achieved primarily by:

- sourcing innovation through our internal research and development, as well as through acquisitions and in-licensing;
- focusing on productivity in order to minimize costs through measures such as leveraging industry overcapacity and outsourcing commodity services;
- focusing on critical skills and capabilities needed to bring new
- technologies to the market;
- pursuing life-cycle management programs for currently marketed products to increase such products' value during their commercial lives; and
- acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

(emphasis added).

30.     The Prospectus Supplement continues further to discuss Valeant's

inventory stating in relevant part:

Even after the inventory held by wholesalers has reached desired levels, wholesalers will make estimates to determine end-user prescription demand, and may not be completely effective in matching their inventory levels to actual end-user prescription demand. In addition to wholesalers, *inventory is held at retail pharmacies and other non-wholesale locations over whose buying patterns we will have limited influence*. Adverse changes in economic conditions and other factors may cause retail pharmacies to reduce their inventories of the combined company's GI products, which would reduce their orders from wholesalers and, consequently, the wholesalers' orders from the combined company, even if end-user prescription demand has not changed. As a result, changes to inventory levels held by wholesalers may cause the combined company's operating results to fluctuate unexpectedly if the combined company's sales to wholesalers do not match end-user prescription demand.

(emphasis added).

31.    On April 1, 2015, Valeant announced the beginning of the merger with Salix in a press release.

32.    On April 29, 2015, Valeant issued a press release announcing that Defendant Schiller would be stepping down as Valeant's CFO.

33.    On April 29, 2015, Valeant issued a press release containing the financial results for the first quarter of 2015 ending on March 31, 2015. The press release also increased the Company's guidance for the full year of 2015. The press release states in relevant part:

2015 First Quarter Results

• Total Revenue $2.2 billion; an increase of 16% over the prior year despite negative foreign exchange impact of $140 million
    o   Excluding negative impact of foreign exchange and last year's divestiture of the aesthetics injectable business, revenue increased 27% over the prior year

*        *        *

• GAAP EPS $0.21; Cash EPS $2.36, an increase of 34% despite negative foreign exchange impact of $0.12 over the prior year
o   Excluding negative impact of foreign exchange and last year's divestiture of the aesthetics injectable business, Cash EPS increased 50% over the prior year

*        *        *

2015 Guidance

• Increasing Total Revenue to $10.4 - $10.6 billion up from $9.2 - $9.3 billion
• Expect Salix Revenue of ~$1.0 billion in 2015

- Reflects implementation of wholesaler inventory reduction program; plan to reduce Salix wholesaler inventory levels to approximately 1.5 months by year-end
- Increasing Cash EPS to $10.90 - $11.20 per share up from $10.10 - $10.40
- Expect Same Store Sales Organic Growth of >10% for the second through fourth quarters of 2015

34.    The April 29, 2015 press release on earnings also includes comments made by Defendant Pearson, stating in relevant part:

> ***Our first quarter results demonstrate the strong performance of our diversified business model as we exceeded our first quarter guidance*** despite losing $140 million in revenue and $0.12 in Cash EPS to foreign exchange headwinds… The Company delivered exceptional double digit organic growth for the third quarter in a row, driven by the strength of most of our business units around the world.

> (emphasis added).

35.    On April 30, 2015, the Company filed a Form 10-Q for the first quarter of 2015 ending March 31, 2015 (the "1Q15 10-Q"). The 1Q15 10-Q was signed by Defendants Pearson and Schiller. Attached to the 1Q15 10-Q were SOX certifications signed by Defendants Pearson and Schiller attesting to the accuracy of the financial statements, that all fraud was disclosed, and the Company had adequate internal controls. The 1Q15 10-Q makes no mention of Philidor. The 10-Q included in relevant part:

> ***Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized operating structure***. Within our chosen therapeutic classes and geographies, we primarily focus on durable products which

11

have the potential for strong operating margins and sustainable organic growth. Further, we have completed numerous transactions over the past few years to expand our portfolio offering and geographic footprint, including, among others, the Salix Acquisition and the acquisition of Bausch & Lomb Holdings Incorporated ("B&L") in August 2013, and we will continue to pursue value-added business development opportunities as they arise. ***The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense***. We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

(emphasis added).

36.     On June 11, 2015, the Company filed a press release announcing that Defendant Rosiello was to be fulfilling the role of CFO of Valeant and that Defendant Schiller would remain on the Board of Directors and serve as a consultant to Valeant.

37.     On July 23, 2015, the Company issued a press release announcing financial results for the second quarter of 2015 ending on June 30, 2015. The press release also included increased guidance for the full year of 2015. The press release states in relevant part:

2015 Second Quarter Results
• Total Revenue $2.7 billion; an increase of 34% over the prior year
• Excluding negative impact of foreign exchange ($173 million) and the contribution of Salix ($313 million), revenue increased 27% over the prior year
• GAAP EPS Loss of $0.15; Cash EPS $2.56

- Excluding negative impact of foreign exchange ($0.13) and the negative contribution of Salix ($0.04) , Cash EPS would have been $2.73, a growth rate of 43%

\*       \*       \*

Full Year 2015 Guidance Update
- Increasing 2015 Total Revenue to $10.7 - $11.1 billion up from $10.4 - $10.6 billion
- Salix revenue expected to be ~$1.2 billion
- Increasing 2015 Cash EPS to $11.50 - $11.80 per share up from $10.90 - $11.20 to reflect continued business outperformance and approval of IBS-D indication for Xifaxan
- Increasing Adjusted Cash Flow from Operations to greater than $3.2 billion, up from greater than $3.1 billion
- Expect Same Store Sales Organic Growth of >10% for second half of 2015

38.     Defendant Pearson's comments included in the earnings press release

state in relevant part:

> We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% organic growth…***Our strong second quarter results were driven by outperformance in our U.S. businesses***, strong results in certain emerging markets and outstanding starts to both the Salix and Dendreon acquisitions. In addition, we have signed eight new transactions so far this year and have realized several significant R&D milestones, including the approval of Xifaxan for IBSD and the NDA submissions for Vesneo and Relistor Oral. ***As a result, we feel confident in raising our guidance for the remainder of 2015***.

(emphasis added).

39.     On July 27, 2015, the Company filed a Form 10-Q for the second

quarter of 2015 ending June 30, 2015 (the "2Q15 10-Q"). The 2Q15 10-Q was

signed by Defendants Pearson and Rosiello.   Attached to the 2Q15 10-Q were

SOX certifications signed by Defendants Pearson and Rosiello attesting to the accuracy of the financial statements, that all fraud was disclosed, and the Company had adequate internal controls. The 2Q15 10-Q made no mention of Philidor.  The 2Q15 10-Q included in relevant part:

> Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized operating structure. Within our chosen therapeutic classes and geographies, we primarily focus on durable products which have the potential for strong operating margins and sustainable organic growth. Further, we have completed numerous transactions over the past few years to expand our portfolio offering and geographic footprint, including, among others, the Salix Acquisition and the acquisition of Bausch & Lomb Holdings Incorporated ("B&L") in August 2013 (the "B&L Acquisition"), and we will continue to pursue value-added business development opportunities as they arise. The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense. We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

> \*        \*        \*

> In connection with our acquisitions, we have implemented cost-rationalization and integration initiatives to capture operating synergies and generate cost savings across the Company. These measures included:
> • workforce reductions across the Company and other organizational changes;
> • *closing of duplicative facilities and other site rationalization actions company-wide, including research and development facilities*, sales offices and corporate facilities;
> • *leveraging research and development spend*; and/or

14

• procurement savings.

\* \* \*

As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. Provision balances relating to estimated amounts payable to direct customers are netted against accounts receivable, and balances relating to indirect customers are included in accrued liabilities. . . . ***Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015, respectively, compared with 27% and 26% in the second quarter and first half of 2014. The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%") and (ii) higher rebate percentages for sales to the U.S. government (including Wellbutrin XL®) partially offset by (iii) lower provisions (mainly rebates) associated with products acquired in the Salix Acquisition in the second quarter of 2015***.

(emphasis added).

40.     On September 28, 2015, Valeant filed a Form 8-K with the SEC attaching a letter from Valeant, signed by Pearson, to Valeant's employees "relating to recent changes in Valeant's stock price." However, this letter made no reference to the federal government's skepticism and inquiry into Valeant's prcing practices.

15

41.    On October 5, 2015, the Company filed a Form 8-K with the SEC attempting to correct inaccurate claims about the Company that were being reported in the media.

42.    The statement referenced in ¶¶21-41 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had deficient internal controls, (2) Valeant had a relationship with a network of specialty pharmacies used to boost Valeant's sales of its high-priced drugs; (3) the use of specialty pharmacies left Valeant vulnerable to increased regulatory risks, (4) Defendants were under government scrutiny for its financial assistance programs for patients, pricing decisions and the distribution of its products,  (5) Valeant faced the risk of scrutiny over its price increases, (6) without using specialty pharmacies, Valeant's financial performance would be negatively impacted, (7) without using specialty pharmacies, Valeant's Class Period performance would have been negatively impacted, (8) Valeant's true relationship with Philidor and the extent of that relationship, (9) Valeant controlled Philidor, (10) Valeant's subsidiary KGA had a secured lien interest on Philidor's ownership, (11)  Defendants were engaged in a scheme to manipulate the Company's stock

price, and (12) as a result, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## DEFENDANTS' MISCONDUCT IS REVEALED DAMAGING INVESTORS

43.    On September 28, 2015, the Democrats on the House Committee on Oversight and Government Reform (the "Committee") sent a letter to the committee's chairman asking him to issue a subpoena requiring Valeant to furnish documents relating to its drug prices. This letter revealed that on July 31, 2015, staff members of the Committee had a joint call with Valeant representatives but that Valeant's represenatives "failed to adequately answer our questions about the basis for their skyrocketing prices." The letter continued to say that on August 12, 2015, "Ranking Member Cummings sent the document requests to Valeant" and on September 3, 2015, "Valeant rejected Ranking Member Cummings' request in a dismissive two-page letter that refused to provide any of the requested documents."

44.    On this news of governmental scrutiny and Valeant's lack of response, shares of Valeant dropped $32.97/ share, or over 16%, to close at $166.50/share on September 28, 2015. Valeant's stock continued to fall on September 29, 2015 falling $8.42, or 5%, to close at $158.08.

45.    On October 4, 2015, the *New York Times* published the article "Valeant's Drug Price Strategy Enriches It, but Infuriates Patients and Lawmakers" on its website, *www.nytimes.com*. The article was republished in print on October

5, 2015. The article discusses Valeant's practices of hiking up the prices of drugs and the threat of government action including how "Valeant raised prices on its brand-name drugs an average of 66 percent. . . about five times as much as its closest industry peers." The article also raises the issue of Defendant Pearson's statements made in his September 28, 2015 letter saying that "Valeant is well positions for strong growth, even assuming little to no price increases" but this article pointed out that the 2Q15 10-Q stated that Valeant's growth in the U.S. and other developed markets "was driven primarily by price," not by increased volume.

46.     After market closed on October 14, 2015, Valeant issued a press release entitled "Valeant Provides Update Regarding Government Inquiries" disclosing that the Company was in receipt of subpoenas and inquiries by the government. The press release states in relevant part:

> LAVAL, Quebec, Oct. 14, 2015 /PRNewswire/ Valeant Pharmaceuticals International, Inc. (NYSE: VRX) and (TSX: VRX) today responded to a letter from Senator Claire McCaskill (DMO) concerning the company's products Nitropress and Isuprel. In his response to Senator McCaskill, J. Michael Pearson, the chairman of the board and chief executive officer of Valeant, addressed the history of Nitropress and Isuprel, the reimbursement process for hospital procedures involving Nitropress and Isuprel, the analysis and reasons underlying Valeant's pricing decisions, and Valeant's programs designed to improve patient access, among other topics. The company also disclosed that it is beginning outreach to hospitals where the impact of a price change was significantly greater than the average.
>
> **In addition, Valeant recently received a subpoena from the U.S. Attorney's Office for the District of Massachusetts and a subpoena from the U.S. Attorney's Office for the Southern District of New**

*York. Most of the materials requested by the subpoenas relate to documents with respect to our patient assistance programs, and also include requests relating to financial support provided by the company for patients, distribution of the company's products, information provided to the Centers for Medicare and Medicaid Services, and pricing decisions.* The company is reviewing the subpoenas and intends to cooperate with the investigations.

*"All of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner," stated Pearson. "We remain committed to assisting eligible patients who need our products, and we will be working with the appropriate groups to submit the requested documents and plan to cooperate with the inquiries."*

(emphasis added)

47.    On the adverse news that Valeant was in possession of the subpoenas, Valeant's stock price fell $8.42 per share, a decline of almost 4.75% from the previous day's closing of $168.87 per share.

48.    Before market opened on October 19, 2015, the Southern Investigative Reporting Foundation ("SIRF") published the article "The King's Gambit: Valeant's Big Secret" by Roddy Boyd on its website. According to the SIRF, its goal is to provide in-depth financial investigative reporting for the common good. The SIRF is concerned with the lack of business journalism and its mission to delve into subjects and provide its results with the public. The SIRF's article reveals that R&O Pharmacy filed a lawsuit seeking pre-emptive declaratory relief from Valeant and that there is an undisclosed relationship between Valeant and Philidor, stating in relevant part:

19

According to a lawsuit filed by R&O, Russell Reitz got a letter from Robert Chai-Onn, Valeant's general counsel and director of business development, requesting repayment of $69.8 million for "invoiced amounts." This apparently struck Reitz as odd since R&O had done no business, at least in any direct fashion, with Valeant. Moreover, he had never received a single invoice from Valeant or its subsidiaries.

Reitz forwarded the letter to Gary Jay Kaufman, his lawyer down in Los Angeles, who sent a letter to Chai-Onn on September 8 noting that the lack of invoices from Valeant indicated to him one of two things was happening: Valeant and R&O were being jointly defrauded by someone, or Valeant was defrauding R&O. He suggested they talk it over by phone.

Chai-Onn never responded and on October 6, Kaufman filed suit, seeking a determination from the court that R&O owes Valeant nothing.

There is, however, a hook and as these things go, it's a big one: the Southern Investigative Reporting Foundation has confirmed that Reitz was indeed doing business of some sort through a company called Philidor Rx Services and a man named Andrew Davenport.

Which makes Valeant's demand letter very interesting.

*To understand why, it's important to understand what Philidor is. To the public, it describes itself as a "pharmacy administrator" and, according to a call service operator last Thursday, Valeant is its only client. Located in Hatboro about 30 miles outside Philadelphia, its corporate filings indicate both companies are independent of the othe*r.

Pharmacy administrator appears to be, in Philidor's case, a term of art.

*A better description is a "specialty pharmacy," filling, shipping and getting insurance approval for prescriptions of the more complex drugs Valeant makes. In its third quarter conference call last year,*

*the only instance where Philidor has been publicly mentioned by an analyst, Valeant chief executive Mike Pearson said that perhaps 40% of its business flows through specialty pharmacies. In July, he reiterated the company's guidance for up to $11.1 billion in 2015 revenue, implying that as much as $4.4 billion in product could move through this channel.*

(Note that specialty pharmacies are exempt from reporting the drugs they sell to IMS Health, the tracking service used by companies and analysts to monitor drug sales and inventory channels.)

Like many private companies, Philidor's financials are hard to come by but it is unmistakably an operation of some mass, with around 900 employees and its own legal unit. A Pennsylvania State Senator posted an April 6 interview with company CEO Andy Davenport where he stated the company was on track to process between 12,000 and 15,000 prescriptions daily by December. With prescription costs regularly running into the hundreds and even thousands of dollars, the company could potentially handle upwards of $1.5 billion in product this year.

*A key cog in Valeant's "patient access" program, patients referred to Philidor often receive coupons for reduced or waived co-pay requirements--given to the prescriber by Valeant's sales representatives--and in turn, Philidor would appear to attempt to recoup the cost of the drug from private insurers or Medicare. Theoretically, this makes price increases less risky for Valeant given that a sizable population of a drug's users frequently won't observe them. Still, the patient access program is central to the company's distribution program, and one of the issues the U.S. Attorney subpeonas specifically sought information on.*

Philidor's business practices have generated mixed reviews (at best) on consumer message boards -- including numerous instances of alleged unwanted refills and an allegation of the improper removal of HSA funds. Another message board account alleges that to get reimbursement approvals, prescriptions already denied at larger insurers were "pushed through" their sister pharmacies. (To be sure, comments on these sites can be gamed, both by consumers and the

21

company, and the Southern Investigative Reporting Foundation was unable to verify these accounts.)

*Several questions remain unanswered: On the assumption that there is $69.8 million due someone, why wouldn't Philidor's two in-house attorneys have issued a demand letter to R&O? Similarly, why wouldn't Valeant's high-profile general counsel, when challenged, not provide support for his demand and avoid the risk and expense of litigation? Additionally, if Valeant does have some sort of claim to that nearly $70 million, what then is their real relationship to Philidor?*

*The Southern Investigative Reporting Foundation was able to uncover Valeant's financial connection to Philidor--one that it hasn't disclosed to investors--as laid out below.*

The first task was to establish who owns Philidor. What we discovered was indeed revealing, albeit probably not in the way its owners intended.

Put bluntly, **Philidor has gone to great lengths to conceal its ownership.** Start with a man named Matthew Davenport, the listed principal on most of Philidor's state registrations; additionally, several states list David Wing, John Carne and Gregory Blaszczynski as officers, and a few more have an End Game Partnership LLP listed as an assistant treasurer.

Given Andy Davenport's video above, his role as Philidor's chief executive is clear. Plugging the address of End Game Partnership LLP (which in turn is owned by End Game LLC, a Las Vegas-based entity) from its filings into a search engine turns up a match to a house Andy Davenport owns in Horsham.

A Southern Investigative Reporting Foundation phone call to Philidor's administration revealed that there is no Matthew Davenport, David Wing, (Edward) John Carne or Gregory Blaszczynski working at Philidor. **On the other hand, all four work at BQ6 Media, a pharmaceutical marketing company located**

*about 2.5 miles from the company. At one point, prior to Philidor, Andy Davenport was its CEO. Both BQ6 and Philidor share the same domain registrar, Perfect Privacy LLC. The company's LinkedIn profile lists 28 employees but the majority are consultants or contract workers, with several listing time spent at Philidor.*

The Philidor state registration in North Carolina was particularly helpful in that it listed a broader array of owners than other states.

David Cowen is a former hedge fund manager and Elizabeth Kardos is general counsel for restructuring consultants Zolfo Cooper who are married and own Four Beads LLC; they did not return a message left at their house or reply to an email sent to Ms. Kardos. Nick Spuhler is a BQ6 alum who could not be reached, David Ostrow is a Physical Therapist and golf swing coach who did not return multiple calls to his house and residence, Jeffrey Gottesman is an insurance agent who has a sideline as a competitive poker player; reached on his mobile phone, he declined comment. The address listed for Gina Miller tracked to a code inspection business with no apparent connection to Philidor. Alternatively, a Gina Milner works at BQ6, but it couldn't be determined if she is involved. Fabien Forrester-Charles of Hatboro, Pa. and Francis Jennings of Naples, Fla. could not be reached, and Michael Ostrow of Bala Cynwyd, Pa. did not return a voice message left at his house. Paula Schuler of Old Greenwich, Ct., listed as an owner along with her husband Timothy, said she couldn't talk at that moment; she never returned two follow-up calls.

It is not readily apparent if there are any specific relationships among group members, beyond the general ties to Matthew and Andy Davenport (according to an online database they appear to be brothers), BQ6 and Philadelphia. One that does jump out is David Cowen and Andy Davenport's tenure together at hedge fund Quasar Financial between 2004 and 2008; Davenport also donated to the Museum of American Finance, where Cowen is the president.

Not every state looked kindly upon the way Philidor went about securing out-of-state pharmacy operation privileges. California took exception to Matthew Davenport's attempt to register as Philidor's principal and rejected the company's application for a Non-Residency

Pharmacy Permit in May 2014. *The state's Department of Consumer Affairs Board of Pharmacy cited a series of disclosure-related problems, specifically his swearing to what was termed "false statement of facts" on the application, several of which involved the failure to disclose Philidor's ownership group, as well as Andrew's 27% ownership stake.*

(A brief aside: Francois-Andre Philidor was an 18th century French Chess master, writing a book about it, The Analysis of Chess. BQ6 Media is named after the chess shorthand for Bobby Fisher's legendary move against Russian chess master Boris Spassky in 1972. Another popular chess move is the King's Gambit Accepted, or as it's often referred to in chess notation, KGA.)

Establishing the economic connection between Valeant and Philidor was less time-consuming.

As it happens, *Valeant has a wholly-owned unit named KGA Fulfillment Services Inc., that was formed in Delaware in November, 2014. Its only mention in any Valeant filings is that sole line in last year's annual report. An exhaustive search didn't turn up any references to it in trade publications, nor state and federal databases. (What the initials stand for, apart from the similarity to the chess strategy, is unknown.)*

*The Southern Investigative Reporting Foundation found KGA Fulfillment Services listed as the "secured party" on UCC-1 liens placed this January and February against the members of Philidor's ownership group. These liens are the public notice that a lending entity may have an interest in the debtor's personal property. In this case, Valeant/KGA lent money to Philidor's ownership group and per the rules, is announcing that their equity stakes in Philidor are potentially collateral.*

The UCC-1 financing statements for the group are: David Cowen and Elizabeth Kardos, Timothy and Paula Schuler, Nick Spuhler, Andrew Davenport Trust, David Ostrow, David Wing, John Carne, Matthew Davenport, Fabien Forrester-Charles, End Game Partnership LLP, End Game LP and Michael Ostrow.

24

That an important financial relationship exists between Philidor and Valeant's KGA unit is inarguable; why it exists is much less clear. From the standpoint of rational self-interest, the owner of a rapidly growing business would almost never want to borrow against their equity stake, let alone from the newly launched subsidiary of the enterprise's sole customer.

(emphasis added).

49.     Before market opened on October 19, 2015, Valeant held a conference call to discuss the third quarter of 2015 earnings results. On the call where Defendants Pearson and Rosiello. On conference call Valeant, for the first time, mentioned Philidor, Valeant's relationship with Philidor, and that Valeant consolidates Philidor's revenue. During the conference call, Defendant Pearson stated in relevant part:

> *Turning to how does Valeant work with specialty pharmacies specially Philidor*. The top of specialty pharmacies has not been a focus of our in past calls because we believe this was at competitive advantage that we did not disclose to our competitors. But given all the incorrect assertion by some, we will provide an update on this call. Similar to many pharmaceuticals companies in the US, *an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies. We find specialty pharmacies improved patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medication they believe most appropriate for their patients. In almost all cases, our inventory was specialty pharmacies and this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled*. We find they significantly reduce our distribution fees and product returns. Currently only $50 million of inventory at WAC or gross price sits in the US specialty pharmacy channel. This is a small fraction, less than 5% of our total in

25

channel inventory. The largest component of this specialty inventory is Arestin.

*Philidor, one of our specialty pharmacy partners, provides prescription services to patients across the country, and provides administrative services for our co-pay cards and is a dispensary that fills prescriptions. We have a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor if we so choose. Given accounting rules, we consolidate Philidor's financials. Inventory held at Philidor remains on Valeant's books and is not included in the specialty pharmacy channel inventory.*

For many of our dermatology products, Philidor and other specialty pharmacies, dispense our medicine before adjudication of the reimbursement is finalized. To ensure patients get their medicines prescribed quickly as a result we take on a risk for non-reimbursement.

We understand that Philidor provides services under our programs for commercially insured and cash-paying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs. It does not restrict prescriptions it fills to any particular manufacturers. It dispenses generic products as specified in the patient's prescription or as requested by the patient.

*Any non Valeant prescription dispensed by Philidor are recorded as other revenue in our income statement not product sales, and are therefore excluded from our organic growth calculations.* The revenue for non Valeant products is approximately $1 million per quarter. *Since we do not recognize the revenue of our products till the prescriptions are filled, this consolidation has the impact of delaying revenue recognition as compared to products that are sold through traditional distribution channels.*

Next question. Why did Valeant's General Counsel send a letter to R&O? R&O is in one of the specialty pharmacies in our network and Valeant shipped approximately $69 million at wholesale prices to them. This represents approximately $25 million at net prices. Any products R&O dispense to patients were recognized as our revenues

and are reflected in our receivables. Any products still held by R&O are reflected in our inventory. R&O is currently improperly holding significant amounts it received from payers. We will refrain from comment on active litigation and look forward to showing in court that we owed the money.

Valeant patient assistant program are administered by a reputable, third party and we fund foundations that have multiple donors. Eligibility is determined by the independent foundations. It is also important to not that eligibility for in house commercial access programs is limited to patients not covered by government programs. Looking at history, our commitment to patient in assistance program is growing at annual compound rate of 128% from $53 million in 2012 to approximately $1 billion we expect to spend in 2016.

Recent government inquiries. As you all know, Valeant has responded to Senator Claire McCaskill and addressed her questions regarding Nitropress and Isuprel. In a letter to her last Wednesday, we discussed the history of Nitropress and Isuprel. The reimbursement process for hospital procedures involving Nitropress and Isuprel, the analysis and reasons underlying Valeant's pricing decisions, and Valeant's programs designed to improve patient access, among other topics. We also noted that we are beginning an outreach to hospitals where the impact of a price change was significantly greater than the average. ***The company recently received a subpoena from the U.S. Attorney's Office for the District of Massachusetts and a subpoena from the U.S. Attorney's Office for the Southern District of New York.*** Our counsels are already in touch with the government and the company intends to cooperate in investigations. We will not be answering questions or providing more information that was already covered in the press release on these matters.

Our approach to compliance and legal. Like other critical areas, we take both compliance and legal compliance seriously. For the past five years we have under a Corporate Integrity Agreement started under legacy Biovail, and this CIA was just recently concluded. The CIA required extensive written policies and systems, significant training, well functioning compliance committee, and an annual audit by an independent organization. We were also required to file annual reports with OIG. Our final report was filed in early 2015.

27

(emphasis added).

50.     On the conference call, Defendant Pearson had the following exchange with Morgan Stanley analyst, David Risinger:

> **David Risinger** - Morgan Stanley
> That's great. And then just separately, you discussed alternate fulfillment, could you just put that in perspective, maybe what percentage of the US brand Rx business alternate fulfillment is and how much of that is Philidor?
>
> **Mike Pearson** - Chairman and CEO
> Sure. It's really primarily our dermatology brands and then some of our specialty products like Ruconest, Arestin and some of the products that some of the other orphan drugs. For certain products it is quite larger, for Jublia it is probably 50%, for a lot of other dermatology it is much, much less. David, I am sorry I can't-- it's significant but I don't know the precise number but it is certainly of our US portfolio, so 10%, 20% maybe, maybe Tanya's nodding probably closer to 10%.

51.     Defendant Pearson also stated on the conference call that Valeant had not disclosed the nature of its relationship with specialty pharmacies previously by stating:

> The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors.

52.     That same day, Valeant released its second quarter of 2015 presentation for investors. The presentation states in relevant part:

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages
- Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies
- We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients
- In almost all cases, our inventory with specialty pharmacies and the title for our medicines only transfer to the pharmacy when the actual prescription is filled – this significantly reduces our distribution fees and product returns. Less than 5% of our U.S. channel inventory sits in the specialty pharmacy channel
- Philidor, one of our specialty pharmacy partners, provides prescription services to patients across the country, and provides administrative services for our copay cards and is a dispensary that fills prescriptions. We have a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor
- ***Based on a VIE (variable interest entity) assessment in accordance with ASC 810, we consolidate the financials of Philidor. Inventory held at Philidor remains on Valeant's books and is not included in the specialty pharmacy channel inventory***
- For many of our dermatology products, many of our specialty pharmacies, including Philidor, dispense Valeant medications before adjudication of the reimbursement may be finalized. Patients get their medicines more quickly and Valeant takes the risk for non-reimbursement
- We understand that Philidor:
  - Provides services under our programs for commercially insured and cashpaying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs
  - Does not restrict prescriptions it fills to any particular manufacturers (including Valeant)

> o   Dispenses generic products as specified in patient's prescription or as requested by patient

(emphasis added).

53.   On this news, Valeant's stock price fell $13.73 per share, a decline of over 7.7% from the previous day's closing of $177.56 per share.

54.   On October 19, 2015 the article, "Drug Makers Sidestep Barriers on Pricing" by Andrew Pollack was published on *www.nytimes.com*. This article was republished in print in the *New York Times* on October 20, 2015, The article details the use of specialty pharmacies and Valeant's high pricing of its drugs stating in relevant part:

> The pain reliever Duexis is a combination of two old drugs, the generic equivalents of Motrin and Pepcid.
>
> If prescribed separately, the two drugs together would cost no more than $20 or $40 a month. By contrast, Duexis, which contains both in a single pill, costs about $1,500 a month.
>
> Needless to say, many insurers do not want to pay for Duexis. Yet sales of the drug are growing rapidly, in large part because its manufacturer, Horizon Pharma, has figured out a way to circumvent efforts of insurers and pharmacists to switch patients to the generic components, or even to the over-the-counter versions.
>
> It is called "Prescriptions Made Easy." Instead of sending their patients to the drugstore with a prescription, doctors are urged by Horizon to submit prescriptions directly to a mail-order specialty pharmacy affiliated with the drug company. The pharmacy mails the drug to the patient and deals with the insurance companies, relieving the doctor of the reimbursement hassle that might otherwise discourage them from prescribing such an expensive drug.

Horizon is not alone. *Use of specialty pharmacies seems to have become a new way of trying to keep the health system paying for high-priced drugs. Valeant Pharmaceuticals International, which has attracted government and media scrutiny for its huge price increases, does much the same thing for its dermatology products with a specialty pharmacy called Philidor Rx Services.*

"They are all trying to get rid of the sticker shock of using their drugs," said Dr. Kenneth Beer, a dermatologist in West Palm Beach, Fla. "They become the drugstore now," he said.

He said Valeant's program, which he had used, buffered physicians from insurers and complaints from their patients about high prices.

"It lowers one barrier to using their products," he said.

*Valeant revealed last week that it had received subpoenas from federal prosecutors in Manhattan and Massachusetts seeking information about its financial assistance programs for patients, pricing decisions and the distribution of its products.* It is not clear if the probes are related in any way to Valeant's relationship with Philidor.

*Philidor, based in Hatboro, Pa., reveals little about itself on its website. It was denied a license in California in 2014 because, the state said, its application had not truthfully identified its owners and financial officers. Calls on Monday asking to speak to Philidor executives were not returned.*

*Valeant had said little about Philidor until Monday, when J. Michael Pearson, Valeant's chief executive, revealed on his company's quarterly earnings call that Valeant had purchased an option to acquire Philidor late last year. He said that Valeant consolidated Philidor's results in its own financial reports.*

Mr. Pearson also said on the call that the pricing environment had changed, and that the industry was "being aggressively sort of attacked for past pricing actions." He said that Valeant was considering divesting the division selling neurological drugs where, he said, the biggest price increases had occurred.

31

He also said that in the future, price increases would be "more modest," probably not more than 10 percent a year. Last year, he said, increases in list prices averaged 36 percent for the branded drugs sold by Valeant in the United States.

***Specialty pharmacies are most known for providing patients with assistance with complex drugs, many of them requiring refrigeration and injections, for diseases like cancer, multiple sclerosis and rare genetic disorders. But the drugs dispensed through the specialty pharmacies used by Horizon and Valeant are for common ailments like arthritis pain, acne and toenail fungus.***

"What was started as administering complex, costly drugs has been co-opted as a sales/marketing tool to drive the growth of minor differentiation standard retail drugs," Ronny Gal, a pharmaceutical analyst at Bernstein, said in a note on Friday. The programs do offer advantages to patients. The drugs are delivered quickly and co-pays are subsidized. Horizon said 98 percent of patients getting Duexis have co-payments of no more than $10, less than the co-pays would be for generics in many cases.

 (emphasis added).

55.    On this news, Valeant's stock price fell $17.09 per share, a decline of over 10.4% from the closing price of $163.83 per share on October 19, 2015 to close at $146.74 per share on October 20, 2015.

56.    On October 21, 2015, Citron Research published a report entitled "Valeant: Could this be the Pharmaceutical Enron?" (the "Citron Report"). The article reveals more details about the relationship between Valeant and Philidor but also pulls the curtain back to connect how Valeant is affiliated with other undisclosed special pharmacies and Valeant's tactics to create phantom invoices to push funds around in a way to trick its auditors. The Citron Report states in relevant part:

Just four days ago in the world of Valeant, no one had ever heard of Philidor RX. Recent concerns about the company focused on its unsavory business practices of massive prices raises on pharmaceuticals acquired in a rapid succession of acquisitions, while slashing research and development. ***But no one had discussed how these drugs were distributed….until this week.***

On Monday morning before earnings, a report came out of SIRF, uncovering undisclosed relationships with specialty pharmas, namely Philidor RX. Most importantly, the article introduced Wall Street to a court filing made by a company called R&O Pharmacy, filed with the California District Court in September, in which this small regional pharmacy claims it had received an improper demand for payment from Valeant to the tune of $69 million.

Just yesterday, the New York Times increased its scrutiny on Philidor by questioning if its operation was the target of subpoenas recently served on Valeant over its pricing strategy, covered the prior week.

This is Not Where the Story Ends; it is Where the Story Begins

With its quarterly earnings report scheduled for first thing Monday morning, Valeant was well aware of the scrutiny that was about to come down on Philidor and the R&O lawsuit, as both SIRF and the NYT had contacted management. Valeant came prepared for the conference call with pre-written questions and answers -- one about Philador, and one about R&O -- in its slide deck. This is where the cover up begins.

*       *       *

An option? To acquire a company to which you are the only customer? ***Why would Valeant, a major big cap pharma, a darling of the hedge fund crowd, a suitor of Allergan and an aggressive acquirer of pharmas like Salix, Bausch & Lomb, etc., etc., be secretly maneuvering to buy a little known pharmacy with a dubious ownership structure? And then consolidate its financials? Why was this entity NEVER disclosed in any prior company disclosure?*** (See Valeant Slides on Philador here.)

What is being covered up??

33

In the same slide presentation we read Valeant's explanation of a mysterious court document. R&O Pharmacy filed for pre-emptive relief in California District Court for having received a demand for $69 million from Valeant, stating it had no invoices from Valeant. Valeant's explanation was this one slide



So we are to believe that Valeant putatively owns Philidor and is acting as its "protector" in sending the demand letter to R&O for payment? The story seemed a bit far-fetched, but it was somewhat plausible if you wanted to suspend all disbelief.

***But after a fair amount of due diligence Citron is about to post the line that should send alarm through all Valeant shareholders:***

***Philidor Owns R&O Pharmacy.***

***Citron believes the whole thing is a fraud to create invoices to deceive the auditors and book revenue. PHANTOM ACCOUNTS. Here is the reasoning***.

The Smoking Gun!!

34

From the links below, it is obvious that Philidor and R&O are ARE THE SAME COMPANY AND SHARE MANAGEMENT. The two companies have the same patient privacy disclosure, in fact formatted identically, on both companies' websites. Note the R&O website refers to themselves as Philidor



http://randopharmacy.com/downloads/ro_npp.pdf



http://www.philidorrxservices.com/downloads/philidor_npp.pdf

(Yes we've archived these pages and will republish them in case the links are down by the time you click on them.)

And look! The pharmacies -- R&O, in Camarillo California, and Philidor RX in Horsham PA, have the identical toll free number to reach their Privacy Officer (at the bottom.) Now that's some service!



http://randopharmacy.com/downloads/ro_npp.pdf

http://www.philidorrxservices.com/downloads/philidor_npp.pdf

If you dial the fax # on the R&O website and press 1, you will get Philidor RX. It does not stop at an R&O phone.

And as if this isn't enough, it appears to Citron that Valeant/Philidor have created an entire network of phantom captive pharmacies ... the same privacy notice appears on several other "ghost ship" putative pharmacy                                      websites.
http://westwilshirepharma.com/downloads/ww_npp.pdf
http://saferxpharma.com/downloads/saferx_npp.pdf
http://orbitpharmacy.com/downloads/orbit_npp.pdf

Oh, and as by mere coincidence, these all have the same Privacy Officer contact phone number: (855) 815-7688. And these domains were all registered on the same day! [ Click Here to See them all ]

It is apparent to Citron that Valeant has created a network of "pharmacies" as clones of Philidor. Why do these exist? Citron believes it is merely for the purpose of phantom sales or stuff the channel, and avoid scrutiny from the auditors.

36

How Can This Be, Citron ? Doesn't the Head of the Audit Committee have Any Responsibility Here?

Let us not forget that the head of the Valeant audit committee is Norma Provencio. Mrs. Provencio herself was a director of Signalife which was run by now convicted stock fraudster Mitchell Stein. She was in fact his close associate for years -- information now conveniently omitted from her biography. Mrs. Provencio's integrity was first challenged by Bronte Capital in this posting you should read for yourself. Now the relevance of its full context becomes clear.

*     *     *

Citron has seen this movie before. In 2008, Arthrocare, a successful medical device company, was doing its dirty deeds through Discocare, an undisclosed captive "independent company". When Citron exposed the relationship, Arthrocare tried to make it all go away by announcing it was buying Discocare. At the time, virtually every investment banking house on the Street had a "buy" or "strong buy" on Arthrocare, and Goldman-Sachs had been engaged to "explore strategic alternatives". The entire thing began to unravel when Citron discovered -- and published -- that Arthrocare and Discocare -- ostensibly separate companies, had the same fax number.

The CEO of Arthrocare is now doing 20 years.

While it is impossible for Citron to state for certain at this point, this has the distinct aroma of product being jammed into a channel. It had to have started small, and now it's just too big. "We have an option to purchase Philidor" is simply ... trying to put the genie back in the bottle.

Conclusion

All truths are easy to understand once they are discovered; the point is to discover them……Galileo Galilei

Citron Research has delivered the proof that something really stinks at Valeant and it is goes beyond their egregious price hikes

37

All of a sudden, one thread unravels this whole web of deception. From the moment of the first public mention of Philidor, within 72 hours, Valeant is now holding an option to acquire Philidor and investors find out only in retrospect that Valeant has been consolidating Philador financials? Let's get the explanation -- Certainly Mr. Lay and Skilling had one all the way down to the trial -- and in which they still blamed the short sellers.

57.    On this adverse news, Valeant's stock price fell $28.13 per share, a decline of over 19% from the previous day's closing of $146.74 per share.

58.    After the market closed on October 21, 2015, Philidor issued a press release stating that it had a contractual relationship with "affiliated pharmacies" which include R&O and that Philidor "does not currently have a direct equity ownership in R&O Pharmacy or the affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

## **PLAINTIFF' CLASS ACTION ALLEGATIONS**

59.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Valeant securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Valeant securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Valeant or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Valeant;

c.     whether the Individual Defendants caused Valeant to issue false and misleading financial statements during the Class Period;

d.     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.     whether the prices of Valeant securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

65.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.     the omissions and misrepresentations were material;

c.     Valeant securities are traded in an efficient market;

d.     the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.     the Company traded on the NYSE and was covered by multiple analysts;

f.     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.     Plaintiff and members of the Class purchased, acquired and/or sold Valeant securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

66.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

67.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## FIRST CAUSE OF ACTION
### Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     This cause of action is asserted against all Defendants.

70.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell Valeant's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

42

71.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Valeant as specified herein.

72.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Valeant's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Valeant and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers Valeant securities during the Class Period.

73.     Each of the Defendants' primary liability, and controlling person liability, arises from the following: (a) Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their

43

responsibilities and activities as senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's  plans, projections and/or reports; (c) Defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's, operations, and (d) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

74.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Valeant's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

75. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Valeant's securities was artificially inflated during the Class Period.

76. In ignorance of the fact that market prices of Valeant's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Valeant's securities during the Class Period at artificially high prices and were damaged thereby.

77. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Valeant's financial results and condition, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Valeant securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

78.     By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

80.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CAUSE OF ACTION
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.     This second cause of action is asserted against each of the Individual Defendants.

83.     The Individual Defendants acted as controlling persons of Valeant within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's dissemination of information to

the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contend are false and misleading. The Company Defendants and Defendant Wei were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

84.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

85.   As set forth above, Valeant and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

86.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class

suffered damages in connection with their purchases of the Company's common stock during the Class Period.

87.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff' purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

b.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Awarding such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: October 23, 2015                Respectfully submitted,

                                        **THE ROSEN LAW FIRM, P.A.**

                                        /s/Laurence Rosen_____
                                        Laurence Rosen, Esq. (LR-5733)
                                        609 W. South Orange Avenue, Suite 2P
                                        South Orange, NJ 07079
                                        Tel: (973) 313-1887
                                        Fax: (973) 833-0399
                                        Email: lrosen@rosenlegal.com

                                        Counsel for Plaintiff